Good morning, your honors. May it please the court, Keith Ruttman for Mr. Bates. I'd like to request two minutes for rebuttal, if I may. Your honors, recognizing that drama is best left perhaps to the trial court, I can't help myself but to wonder what your reaction would be if I came up here and said to you, I'm not saying anything right now. You might respond by saying the matter is... You're a relief. Well, you might say the matter is submitted. You might say we've read the briefs and we're familiar with the record and the evidence. We don't need to hear from you. You might say answer our questions. You might say we want to hear your argument and we're not going to let you go until you leave. And I suggest to you that's exactly the situation that Mr. Bates found himself in after the two detectives had read him this stuff, close quote, so everything was on the quote up and up. At 1.30 in the morning, he gave a version of events which clearly disagreed with the physical evidence that the seasoned homicide detectives had evaluated prior to that time. What did you say in the last 20 words? What did I just say? That they read him this stuff and so everything was on the up and up. And he told them a story that clearly was at odds with what the detectives believed the physical evidence that they had evaluated would establish. They clearly didn't believe him. Nevertheless, when they kept asking him, we just want to know what happened. Tell us your version of events. In your view, would the officers have been able to clarify the statement because of the phrase right now? Would they have been able to say, well, do you mean you don't want to talk to us at all or do you just need a break? They could have and probably should have. I'm sorry. Should have done that. I would suggest that under Davis, which in Anderson, the on-bound court, they said it doesn't technically apply because it's in the right to counsel context, but nevertheless it has some persuasive force. That would have been the best course of action. That's not what they did. They instead said basically here's the deal. Listen to me. We're trying to give you an opportunity. Why don't you tell us what happened? The next detective, we're trying to help you out. Tell us what happened. And then if they go on and again they say, we think we know what happened. We think you know what happened. Tell us what happened. Over and over. And then he broke down and told them everything that happened. They didn't ask for clarification. Counsel, if we agree with you that he did invoke his rights and they should have a fair and adequate question in him, there was adequate evidence to show that he committed the crime. So tell us what the harmless error is. Sure. Who did it was never an issue in this case. What happened and why he did it clearly was. And in an abundance of caution, I believe, because I think Judge Kennedy could have not, the trial court could not have given the whole gamut of instructions on every possible theory of homicide. He nevertheless did first-degree murder, secondary murder, voluntary manslaughter, involuntary manslaughter, the difference between manslaughter, put it all to the jury and basically said, here, you have the law that once you figure out what the facts are, you can determine what law applies and make your finding, and they came down on the side of second-degree murder with no deliberation or premeditation. But all that came from his statement. As they said, the Ninth Circuit said in Anderson, quoting the Supreme Court, a confession is probably the most powerful evidence there is. To me, I would suggest that the prejudice comes from the fact that his explanation from his own mouth convicted him. Without that explanation, I submit there was sufficient evidence from third parties about a dispute between the two, a fight that had happened earlier in the day. There was actually evidence of bruises on the victim's knuckles suggesting that there had been some sort of fight. That would have been enough evidence for a skilled advocate to argue for a lesser charge of manslaughter or self-defense, even if the jury would not have accepted a self-defense theory. But that's not the way it played out. It played out from his own mouth, this is what happened, and clearly the jury did not believe him. If he had not been required to make a statement to the authorities and his counsel had chosen to call him and put him on the witness stand with sufficient preparation, he probably could have answered questions better in a light more favorable to himself, subject, of course, to cross-examination. When he talked about administering CPR, when did that occur? Right after he was stopped? Because as I remember, he called up the lady in the community center and told her what happened. I don't know whether he told her that he had tried CPR or not at that time. And then he reported to her, she reported to the police, and when the police arrived he was walking in the direction opposite to where the body, the victim, lay. And when did he talk about CPR? Was it at the time before or after he was given his Miranda warning? Well, he was Miranda's right at the outset. He talked about giving CPR as an explanation for how the blood got on his shirt that he claimed to be leaning down over the victim. There was also evidence of bruises and broken ribs to the victim, which could have come from an attempt to resuscitate. But he clearly talked about that before the detectives, before he, as I posit, he invoked his right to remain silent. Off the top of my head, I can't recall if he mentioned that to the theater worker. It seems unlikely that he would have talked to her about that. I don't recall her testimony suggesting that he mentioned giving CPR. But it's also possible he talked to the detectives before he was taken into custody. I don't recall that specific evidence. But clearly he was talking about giving CPR before he made the statement. I'm not saying anything right now. But we do believe that it was prejudicial, Your Honor, for the reason that... Even if you didn't have the, even if you didn't have his statement to the police, and they were skilled interrogators, no question about that. But just from the physical evidence, you know, the splattered patterns, the blood on his pants, the blood under his sweatshirt that he reversed, and the blood on the rocks, and the arguments that they had, why isn't that enough? Well, that's enough evidence to show that he was the perpetrator. But that's not enough evidence, I would submit, to show what actually happened. The evidence, all that evidence, the blood splatter, is not inconsistent, I would submit. With a fight having started, perhaps he knocked the victim out, and then when the victim was laying prone on the ground, then took all the steps that that physical evidence would establish that were committed. That's not inconsistent with that happening. They did present a lying in wait theory, which was first-degree murder. The jury clearly rejected the notion that he was laying in wait for the victim. So I see that I have one minute or so left. I'm not sure if that counts for my rebuttal time or not. It does. The time on the clock is your total time. Okay. Then I'd like to reserve the balance for rebuttal unless the Court has any further questions. Okay. Thank you, Your Honors. Good morning, Your Honors. My name is Christopher Beasley, Deputy Attorney General on behalf of the appellee respondent. At the outset, what's ---- Well, tell me, when he said, I'm not saying anything right now, why didn't they stop? Because it was not an unequivocal indication. Oh, come on now. He said, I'm not saying anything right now. But if you look at ---- He's telling him he's invoking his right to remain silent. If they had any respect for Miranda, they would have respected that. If you look at the overall context of ---- They could have said, well, you don't want to say anything right now? Yeah. You want us to wait? You want us to talk to us later? Then they got an answer. But he said, I'm not saying anything right now. However ---- In other words, he's invoking his right to remain silent. If you look at the overall context of the interview, and if you look at the context of how this statement was presented, it was not an unequivocal assertion of the right to silence. Now, are we supposed to look at the surrounding context? We look at the statement. Yes. We look at the statement itself, and we do not look at the statement in isolation. No, but the question that preceded it directly was setting up a scenario and saying, isn't that what happened? And he said, I'm not saying anything. Now, so he's being questioned about what happened, and he says, I'm not saying anything. Doesn't that sound to you like he doesn't want to talk to them? Now, he does say it right now, but they didn't ask him to clarify whether he just wanted a break, something to drink, a bathroom break, something. They just went right in and said, tell us, you know, what happened. Excuse me just a second. There's a flashing red light over there. No, no, just. You see it? Huh? It's not a laser, is it? All right. Okay. Judge Graber, in response to your query, the statement, the question that preceded it, isn't that what happened? It's not the only part of the context that you have to look at. You also need to look at overall his kind of responses throughout the interview. He was very cooperative with the police and wanted and was more than. That doesn't matter, does it? Doesn't a person have the right to be cooperative and then change their mind and say, for whatever reason, they're tired, they're nervous, they realize they have this right, but they don't have to keep going just because they started out cooperative, do they? Well, that's correct. But then also you have to look at what a reasonable officer would consider whether that was actually an invocation of the right to silence. And based on all of those other kinds of factors, considering how cooperative Mr. Bates was throughout the interview, considering the nature of his responses, his conclusory kinds of responses, that's it. That's all that happened. That's what happened. That's all I have. Well, that's an easy way to get around Miranda. It's a context. It shows disrespect for constitutional rights. As far as I'm concerned, you better turn to whether it was harmful or not. Thank you. That's the only place where you've got a chance. I think you might be correct, Judge Fletcher. This was. Well, you know, Miranda is really an excellent law enforcement tool if used properly. Correct. If it wasn't here. It is an excellent law enforcement tool. But even if there were a violation of Miranda, this error was harmless beyond a reasonable doubt. And actually, for habeas purposes, it was not. It didn't have a substantial injurious effect upon the jury. It couldn't because, as you pointed out, Judge Pragerson, all of the physical evidence was overwhelming. This was a case of. I didn't say overwhelming. Well, I would characterize the physical evidence as overwhelming. This was not, however, a whodunit case. It was a what-is-it case. And all of the evidence supporting a heat-of-passion defense or a self-unreasonable self-defense, all of that evidence came in from the defendant's own words after the invocation. There was no evidence on this record of heat-of-passion. Yes, Karen Placey testified at trial about a fight. But she also testified that it was nothing, that it was just a small skirmish, and she cleared things up. It was a fight over who was eating French fries or chicken fingers. And she was able to tell the boys, enough already, time to share. And she was able to resolve that. All the evidence about any other kind of altercation, about the ripping of a T-shirt or about some sort of a physical fight that took place between Mr. Bates and the decedent, came from Mr. Bates himself. So there is no way that the jury could have been instructed on heat-of-passion or on unreasonable self-defense if the trial court had suppressed the confession from the point of the invocation beyond. So, therefore, this was error that was harmless and could not happen. Let me ask you this. What did he say when he called the center there, talked to the manager who made the 9-1-1 call? What did he say? He said to Laurel Ruiz, who was in the center, call the police. There's a guy out here who's had his head bashed in. Then, when he's talking to the police, before any invocation of a right to silence, did you notice the condition of his head? No, I did not notice the condition of his head. Already he's lying to the police. All of that would have been admissible to the jury for consciousness-appeal purposes. There would have been no evidence at all supporting a voluntary or involuntary manslaughter instruction if the trial court had suppressed the confession. And it is for that reason, Judge Fletcher, that this was harmless and there was no prejudice that could come from the admission of the confession. So they really did him a favor, huh? They really did. This confession inured to his benefit because it did provide the jury with theories of culpability that were less than first-degree and also second-degree murder. I'd also submit to you, Your Honors, that if you look at the defense theory of the case and the affirmative defense evidence that was presented to the jury, the defense was that this wasn't first-degree murder. That's why they put on the psychologist to talk about the defendant and his mental condition and his mental capabilities. That's why they put forth the testimony of his mother, who testified about his developmental problems as he was growing up. This was not a defense of all the way down to manslaughter as far as the affirmative evidence is concerned. That defense as far as going to voluntary or involuntary manslaughter was provided and enabled because the trial court admitted the confession. And the jury accepted that it wasn't first. That's correct. That's correct. And the jury concluded that this was a second-degree murder. So when all is said and done, even if this court... We really don't know why they accepted that, do we? Sure we do. Well, how? Because of the nature of... We don't know how they arrived at it. We can say with great assurance that this case was a second-degree murder case, nothing more and nothing less. And we can say that based upon the physical evidence and upon the defendant's statements to the police before he ever talked to the police. We can see with reasonable assurance, with overwhelming assurance that this was a second-degree murder and that the jury reached the proper conclusion. And that admission of the confession had no substantial injurious effect upon the jury. So why did they offer it? Why was it offered? Yeah. It was offered because it also, that confession, also tended to support a first-degree murder theory. Because it was in the confession after the invocation in which the defendant talked about sneaking up to the victim, that the victim was asleep. And so such evidence would have supported a lying in wait or a first-degree premeditation and deliberation kind of theory for first-degree murder. That's why the prosecutor wanted that evidence in. It was a two-edged sword, however, because not only did it go towards a first-degree murder theory, it also cut the other way to mitigate the culpability of the defendant so that it would support a manslaughter type of culpability. And so that's why the prosecutor wanted. The prosecutor wanted to go all the way with a first-degree murder. And by getting that confession in, he also opened the door for the defense to be able to present a manslaughter theory for this particular case. If there are no further questions from the Court, we would ask the Court to affirm the judgment of the district court denying the writ of habeas corpus. And on that, it would submit. Thank you. Well, I think counsel helped me in a way because the problem is it's a two-edged sword. It's not a sword and a shield. It cuts against both ways. And it seems like the jury came out right in the middle in some sort of compromise, even though we have no way of affirmatively knowing that on the record. And I think at the end of the day, when a trial counsel is faced with what evidence do I have, he's going to put his best foot forward. He clearly was concerned that the jury would not believe his client's testimony. He didn't put him on the witness stand to testify. He did put on evidence of mental – his mental state and mental disabilities, which were – If he had been – if he had testified – I should know the answer to this, but I don't, so I'll ask you to help me. Let's assume that either because of the invocation or for other reasons the confession had not come in and your client testified inconsistently with what he had told the police. Wouldn't that material be admissible despite the invocation? It would. It would. So you're positing a trial in which he would have testified to the good stuff, but the bad stuff somehow would magically not come in. But that isn't possible, is it? Correct. The good stuff and the bad stuff would come in, but he would also have the opportunity to explain again subject to cross-examination why he answered the questions of the police the way he did, what he thought he was saying, what he thought they were asking. Did he take the stand? No. No. He didn't, but I was following up because you said he would have had this opportunity to. Right. The trial counsel, you know, you play the hand you dealt, and at that point he's faced with a statement that cuts both ways. It probably was more damaging in his mind. Maybe his client was too nervous to testify. But it's more likely that he still wouldn't have testified and that all the other evidence would have been. You know, you just don't know. It's a rare day, unless you're representing some big-time celebrity, that you get an acquittal without the defendant testifying. Well, you know, I. . . And once a statement has been made, then the defendant can be impeached, and all this stuff can come out. So that's a deterrent to the defendant taking the stand. If you don't take the stand, you know, I don't. I know you're a great defense attorney. Thank you, Your Honor. Too many people acquitted who don't take the stand. Well, if he doesn't take the stand, how could you mount the self-defense? Well, there was evidence, physical evidence, of bruises on the victim's knuckles, suggesting that he had been in a fight recently. There was competent opinion testimony about his violent nature. There was forensic evidence about his blood alcohol level had extrapolated backwards, showed he had a very high blood alcohol level. And there was testimony from independent parties that there was a fight over French fries and chicken fingers. And maybe that settled at the time. But, you know, there's a dynamic between these folks that we just don't know, because it wasn't followed up on by trial counsel. Maybe that's a separate issue, but the question becomes what would a jury reasonably have done without this testimony. Maybe skilled counsel would have made a better job of it than the defendant did at 1.30 in the morning after, admittedly, a very trying day. I mean, he was testified to be a very peaceful person, so we don't really know what motivated him to do all this. But this was certainly not the optimum circumstances under which to give a statement to the authorities. And that's really what we do know. But there was DNA evidence. Sure, there was DNA evidence. There was fingerprint evidence. Well, the police told them they had fingerprints on rocks, but I don't think that ever came to pass. That was just a bluff that they were entitled to make. With that, Your Honor, thank you very much. Thank you. Your Honors, thank you very much. We'll go to the next matter.
judges: Fletcher B. , Pregerson, Graber